STADHEIM & GREAR LTD.
George C. Summerfield (P40644)
(summerfield@stadheimgrear.com)
400 North Michigan Ave., Suite 2200
Chicago, Illinois 60611
Telephone: (312) 755-4400
Facsimile: (312) 755-4408

Attorney for Plaintiff
BRIXHAM SOLUTIONS, LTD., a British
Virgin Islands International Business Company

IRELL & MANELLA LLP
Jonathan S. Kagan (SBN 166039)
(jkagan@irell.com)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Rebecca L. Carson (SBN 254105)
(rcarson@irell.com)
Nima Hefazi (SBN 272816)
(nhefazi@irell.com)
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

Attorneys for Defendant
JUNIPER NETWORKS, INC.,
a Delaware corporation

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BRIXHAM SOLUTIONS, LTD., a British Virgin Islands International Business Company,<br><br>Plaintiff,<br><br>vs.<br><br>JUNIPER NETWORKS, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:13-cv-00616-JCS<br><br>**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

I. An Introduction to the Patents in Suit ............................................................................ 1

II. The proper construction of the disputed terms .............................................................. 1

    A. The Law of Claim Construction ......................................................................... 1

    B. The Disputed Terms of the '652 Patent ............................................................... 3

        1. [a/the] "priority" ...................................................................................... 3

        2. "Pseudowire configuration acknowledgement" ...................................... 4

        3. "existing traffic on the standby Pseudowire" .......................................... 5

        4. "wherein the standby Pseudowire is dynamically selected from a plurality of connections" ......................................................................... 7

    C. The Disputed Terms of the '895 Patent ............................................................... 7

        1. "map data" .............................................................................................. 9

        2. "map data from a first link interface to multiple processing engines in said plurality of processing engines" ................................................ 10

        3. "configured to modify said mapping information in response to a failure of at least one link interface"" ..................................................... 12

III. A word on Juniper's proposed constructions ............................................................... 12

IV. CONCLUSION ............................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*rev'd on other grounds*
  2013 U.S. App. LEXIS 24005 (Fed. Cir. Dec. 3, 2013)……………………………....……..1

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)…………………………………………………………….2, 13

*Vistan Corp. v. Fadei USA, Inc.*,
  2012 U.S. Dist. LEXIS 59348 (N.D. Cal. April 27, 2012) ………………………….......*passem*

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)……………………………………………………………….12

**I.  An Introduction to the Patents in Suit**

Brixham asserts that Juniper has infringed U.S. Patent Nos. 7,940,652 ("the '652 patent") and 7,535,895 ("the '895 patent").  In general terms, these patents are directed to routing data through a telecommunications network via nodal switching devices, such as routers, or packet switches.  The '652 patent pertains to the ability to protect traffic in a packet switch network in the event of network failure.  The '895 relates to the efficient use of the switching resources within a nodal switching device.  Both inventions are valuable to a network designed to switch packets of data so that such packets can get from its origin to its destination.

**II.    The proper construction of the disputed terms**

**A.    The Law of Claim Construction**

Generally, claim terms are given the ordinary and customary meaning that would be ascribed to them by a person of ordinary skill in the field of the invention.  *Vistan Corp. v. Fadei USA, Inc.*, 2012 U.S. Dist. LEXIS 59348 at *3 (N.D. Cal. April 27, 2012) (Spero, J.), *rev'd on other grounds* 2013 U.S. App. LEXIS 24005 (Fed. Cir. Dec. 3, 2013).  "[I]f commonly understood words are used, then the 'ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'"  *Id.* at 5 (citations omitted).

The most "significant source of the legally operative meaning of disputed claim language" is the intrinsic evidence of record, that is, the claims, the specification and the prosecution history.  *Id.* at 4 (citation omitted).  This is because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* (citation omitted).  While claims are to be construed in light of the specification, courts must be careful not to read

limitations from the specification into the claim. *Id.* at 6 (citation omitted). Even if a patent specification describes only a single embodiment, the claims of the patent are not necessarily limited to that embodiment. *Id.*

In some cases, the specification may reveal a "special meaning" given by the inventor that differs from the meaning the term might otherwise possess. *Id.* (citation omitted). In such instances, "the inventor's lexicography governs." *Id.* at 4-5 (citation omitted). Similarly, a specification may reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 5 (citation omitted).

A person of ordinary skill in the art may also look to the prosecution history of a patent to understand how the patent applicant and the Patent Office understood the claim terms. *Id.* at 7 (citation omitted). However, because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*).

Courts may also use extrinsic evidence in construing claim terms if it is necessary, so long as such evidence is not used to "enlarge, diminish, or vary the limitations in the claims." *Vistan*, 2012 U.S. Dist. LEXIS 59348 at *7 (citation omitted). The Federal Circuit has warned, however, that such evidence is generally "less reliable than the patent and its prosecution history." *Id.* at 8 (citation omitted). Thus, courts are free to consult dictionaries and technical treatises so long as they are careful not to elevate them "to such prominence . . . that it focuses the inquiry on the abstract meaning of [the] words rather than on the meaning of the claim terms within the context of the patent." *Id.* at 8 (citation omitted).

**B.     The Disputed Terms of the '652 Patent**

The '652 patent is related to a novel method of "[p]roviding protection to [telecommunications] network traffic using one or more Pseudowires." '652 Patent [Ex. A], col. 2, lines 59-60. A "Pseudowire," in turn, is defined by the '652 patent as "an emulation of a native service over a network." *Id.*, col. 1, lines 18-19. Figure 1A from the '652 patent is an illustration of a Pseudowire system:



This figure shows a telecommunication carrier network comprising four switching nodes A through D. *Id.*, col. 3, lines 14-22. Data that comes into Node A destined for Node B may travel through Node C or Node D. *Id.*, col. 3, lines 22-25. Path A-C-B may be formed using Pseudowires 102, 104 and/or 106. *Id.*, col. 3, lines 25-26. Path A-D-B may be formed using Pseudowires 108 and/or 110. *Id.*, col. 3, lines 26-27. In order to protect the transmission of data on "primary" Pseudowires, standby Pseudowires are established. *Id.*, col. 4, lines 4-11 & col. 5, lines 55-57. Traffic will be switched to a preferential standby Pseudowire in the event of network failure. *Id.*, col. 6, lines 34-45.

    **1.     [a/the] "priority"**

The independent claims of the '652 patent all speak, in relevant part, to the "priority for the

standby Pseudowire." The parties dispute the proper construction of "priority" in that context. Brixham proposes that this term be construed to mean "preference." "Preference" is the ordinary meaning of "priority," which is the first definition that should be considered by the Court. *Vistan*, 2012 U.S. Dist. LEXIS 59348 at *3. Otherwise, this definition is supported by the specification of the '652 patent, which teaches that "[t]he Pseudowire protection configuration parameter includes one or more fields that specify certain protection properties associated with the Pseudowire." '652 Patent, col. 3, lines 64-67. A manifestation of these protection properties is shown in Figure 6:



This figure illustrates the traffic preemption that takes place during a switchover operation. *Id.*, col. 7, lines 26-27. In light of the setup and holding "priorities" assigned to each Pseudowire, during a switchover, "preference" is given to Pseudowire 602. *Id.*, col. 7, lines 27-41. In light of this express teaching, the proper construction of "priority" is "preference."

### 2. "Pseudowire configuration acknowledgement"

The claims specify that a "Pseudowire configuration acknowledgement" is received and

4

indicates "whether the Pseudowire protection configuration parameter has been accepted by the destination node." *See, e.g.,* '652 Patent, claim 1. This plain claim language provides the primary basis for construing this limitation. *Vistan*, 2012 U.S. Dist. LEXIS 59348 at *3. This plain language is also consistent with Brixham's proposed construction of this limitation - "an indication of whether the destination node accepts the emulation of native service over a network that is used in the event of a network failure."[1]

The specification teaches that:

> At the source node, once the Pseudowire configuration acknowledgment is received (206), it is examined to determine whether the Pseudowire configuration has been accepted (208). If, according to the Pseudowire configuration acknowledgment, the Pseudowire configuration has been accepted by the destination, a standby Pseudowire is established . . .

*Id.*, col. 4, lines 26-32.

This passage makes clear that: 1) the acknowledgement is received; 2) the configuration is for a standby Pseudowire, *i.e.,* a Pseudowire to be used in the event of network failure; and 3) the acknowledgement indicates whether the Pseudowire configuration has been accepted. As with the claim language, this passage completely supports Brixham's proposed construction of this limitation – the construction that should be adopted.

### 3. "existing traffic on the standby Pseudowire"

Brixham has proposed construing this limitation as meaning "working traffic transmitted on the emulation of a native service over a network that is used in the event of a network failure."[2] Representative claim 1 of the '652 patent is directed to "a method of providing protection to network traffic" that includes "determining whether to preempt existing traffic on the standby Pseudowire." In other words, the claim language itself contemplates the preemption of traffic

---

[1] Brixham has incorporated the definition of "Pseudowire" from the specification into its proposed construction of this limitation.

[2] Again, Brixham has incorporated the definition of "Pseudowire" from the specification into its proposed construction of this limitation.

already on the standby Pseudowire (*i.e.,* working traffic) in order to protect network traffic in the event of failure.

The '652 patent specification explains that, notwithstanding its "protection" status, a standby Pseudowire can carry network traffic during normal operations. '652 Patent, col. 5, lines 57-58. The specification also describes the "holding priority," which "indicates the relative priority of a currently active Pseudowire with respect to other Pseudowires when the latter attempt to preempt the former's use of the data link." *Id.*, col. 6, line 66 – col. 7, line 2. "Stated another way, [the holding priority] determines how easily a currently active Pseudowire gives up its hold on a data link upon request." *Id.*, col. 7, lines 2-4.

Figure 5 shows the decision true for the preemption of existing traffic:



This figure, at step 504, determines whether preemption is required, *i.e.*, "when the failed link carries more Pseudowire traffic than the available bandwidth on the standby link." *Id.*, col. 7, lines 10-13. It is possible that, if the priorities so dictate, "the standby Pseudowire continues to

transfer its own [existing] data and the data on the failed Pseudowire is lost." *Id.*, col. 7, lines 22-25. The "own data" to which this passage refers is the working traffic already on the standby Pseudowire, *i.e.,* the traffic that such Pseudowire will "continue" to transmit.

These teachings, all of which pertain to "existing traffic on the standby Pseudowire," make clear that such "existing traffic" *must be* working traffic, and Brixham's proposed construction is correct.

### 4. "wherein the standby Pseudowire is dynamically selected from a plurality of connections"

This limitation appears in dependent claim 4. Brixham proposes that this limitation be construed to mean "wherein the standby Pseudowire is automatically selected from more than one Pseudowire."[3] The issue here is whether "dynamically," in the context of this limitation, means "automatically." The specification of the '652 patent describes a system wherein a standby Pseudowire is automatically selected from a plurality of Pseudowires based upon setup and holding priorities. '652 Patent, col. 7, lines 26-41. The subject passage teaches "the *nodes* [switching devices] will initiate switchover." *Id.*, col. 7, line 34 (emphasis added). Such an operation performed by a machine would necessarily be automatic.

### C. The Disputed Terms of the '895 Patent

The '895 patent is directed to the nodal switching device itself, and more specifically to the efficient utilization of resources within the device. '895 Patent, col. 3, lines 29-31. Figure 1 of the '895 patent illustrates an embodiment of the patented nodal switching device:

---

[3] Brixham proposes to incorporate the definition of "Pseudowire" from the specification into this proposed construction.

7



This figure shows switch 90 with an architecture that includes link interfaces 100, 102, 104, and 106, processing engines 110, 112, 114, and 116, switch 108, and fabric 120. *Id.*, col. 5, line 65 – col. 6, line 1. The link interfaces and processing engines are coupled to switch 108, which switches data between the link interfaces and processing engines. *Id.*, col. 6, lines 4-6. The processing engines are also coupled to fabric 120, which switches data between processing engines. *Id.*, col. 6, lines 6-8. This architecture allows one to use the resources of a switch more efficiently, providing for the direction of traffic from any ingress/egress link interface to any ingress/egress processing engine. *See, e.g.,* '895 Patent, Abstract.

### 1. "map data"

Brixham proposes that this limitation be construed as "assign data to frames, channels or slots." The specification of the '895 patent teaches that "[t]he ingress link interface maps data from incoming link channels into virtual channel time slots in switch 90 (step 12)." '895 Patent, col. 7, lines 63-64. Each ingress link interface maps data from link channels to time slots that are presented to TSI switch 108 for switching. *Id.*, col. 7, line 67 – col. 8, line 2. This mapping is illustrated in, *inter alia*, Figures 3A and 3D from the '895 patent, which show mapping data into frames, channels, and slots:



Figure 5 shows the selection of a slot into which data is to be mapped:

9

[Flowchart: Select Slot (64) → Virtual Channel Data? (65); if Yes → Map Virtual Channel Data Into Slot (66); if No → Map Idle Data Into Slot (67) → Forward Slot (68) → loop back to Select Slot]

These illustrations have meaning only if, once a frame, channel, or slot is selected, the data is assigned to that frame, channel, or slot. Further, the ordinary meaning of "map" in this context is "assign." Thus, Brixham's proposed construction is the correct one.

### 2. "map data from a first link interface to multiple processing engines in said plurality of processing engines"

This limitation appears in, *inter alia*, claim 4 of the '895 patent, a claim that also specifies that "*at least one* processing engine in said plurality of processing engines receives data to be processed by said at least one processing engine." '895 Patent, col. 26, lines 17-19. Brixham proposes that this limitation be construed to mean "map data from a first network termination that exchanges data with one or more physical network mediums to any one of a plurality of

10

processors, each processor capable of receiving data from, and transmitting data to, the fabric of a network switch, and processing the data in order to deliver the services provided by that network switch."

This proposed construction is, in large part, the composite of constructions of the various terms contained in this limitation, as shown below:

| TERM | CONSTRUCTION |
|---|---|
| "link interface" | "Exchanges data with one or more physical networking mediums." '895 Patent, col. 6, lines 27-28. "Maps data from link channels to time slots that are presented to [the] TSI [time slot interchange] switch for switching." *Id.*, col. 7, line 67 – col. 8, line 2. |
| "processing engine" | "Deliver the services provided by switch." *Id.*, col. 6, lines 42-43. "Processes packets or cells supported by [the] switch - allowing any processing engine to service data from any medium coupled to a link interface in [the] switch." *Id.*, col. 6, lines 45-48. "An egress processing engine maps egress data into time slots and passes the time slots to [the] TSI [time slot interchange] switch, which receives the time slots into an incoming TSI switch port." *Id.*, col. 7, lines 8-11. |

Put another way, Brixham's proposed construction, in light of the definition of the foregoing constituent terms, reads "map data from a first link interface [a device that exchanges data with one or more physical network mediums] to any one of a plurality of processing engines [devices capable of receiving data from, and transmitting data to, the fabric of a network switch, and processing the data in order to deliver the services provided by that network switch] in said plurality of processing engines."

As Brixham understand the dispute in this matter, the question is whether the data must be mapped to multiple processing engines, as opposed to *any* of such processing engines. The afore-quoted claim language, requiring that only *one* processing engine receives the mapped data answers that question – data need not be mapped to multiple processing engines, and this limitation should not be construed so as to require otherwise.

The description of a preferred embodiment in the specification of the '895 patent supports this construction as well – "[the] TSI switch maps each incoming time slot from an ingress link

11

interface to a time slot in an outgoing set of time slots for *an* ingress processing engine." '895 Patent, col. 8, lines 50-52 (emphasis added). The use of the article "an" clearly indicates that the time slots (data) are mapped to a *single* processing engine. Should a construction be adopted that requires mapping to multiple processing engines, this embodiment would be excluded, and a construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580, 1583 (Fed. Cir. 1996)). There is no such evidentiary support here.

### 3. "configured to modify said mapping information in response to a failure of at least one link interface"

This limitation is a characteristic of the "network switch" claimed in the '895 patent. *See, e.g.,* '895 Patent, claim 1. Brixham has proposed that this limitation be construed as "configured to modify information used to forward data in response to a failure of at least one network termination that exchanges data with one or more physical networking mediums."[4]

Support for this construction is found in the specification's description of the switch's ability to use the Backup Outgoing Port/Slot fields in place of the Outgoing Port/Slot Fields in the event a link interface or processing engine becomes disabled [col. 14, lines 25-30], and in the ability to redistribute the virtual channel slots associated with a failed processing engine among multiple processing engines [col. 14, lines 35-38]. Collectively, these teachings evidence the ability of the network switch to modify the information used to forward data, *i.e.*, to use the Backup fields, in the event of link or processing engine failure. Brixham's proposed construction of this limitation is, therefore, correct, and should be adopted.

### III. A word on Juniper's proposed constructions

Brixham intends to address Juniper's proposed constructions in the responsive claim

---

[4] Brixham has incorporated the specification's definition of "link interface" in this proposed construction. *See* '895 Patent, col. 6, lines 27-28.

12

construction brief once Brixham has had an opportunity to review Juniper's rationale for its proposed constructions. However, it is worth noting at this point that, for six of the seven disputed claim limitations, Juniper has indicated that it will rely to a substantial extent on extrinsic evidence to support its proposed constructions. As noted above, extrinsic evidence may not be not used to "enlarge, diminish, or vary the limitations in the claims." *Vistan*, 2012 U.S. Dist. LEXIS 59348 at *7 (citation omitted). Further, extrinsic evidence is generally "less reliable" than the evidence intrinsic to a patent, *i.e.*, the evidence upon which Brixham relies exclusively. *Id.* at 8 (citation omitted).

Juniper also has identified numerous portions of the patent prosecution histories upon which it intends to rely. This back and forth lacks the clarity of the specification and thus is less useful for claim construction purposes. *Phillips*, 415 F.3d at 1317. In short, Juniper must call forth evidence to support its construction that is less reliable than that cited by Brixham.

## IV. Conclusion

For the foregoing reasons, the Court should adopt the constructions of the seven limitations in dispute proposed by Brixham.

Respectfully submitted,

Dated: March 7, 2014
*s/ George C. Summerfield*
George C. Summerfield
STADHEIM & GREAR LTD.
400 North Michigan Avenue, Suite 2200
Chicago, Illinois 60611
Telephone: (312) 755-4400
Facsimile: (312) 755-4408
summerfield@stadheimgrear.com

*Attorney for Plaintiff
Brixham Solutions, Ltd.*

13

# CERTIFICATE OF SERVICE

I declare under penalty of perjury under the laws of the United States that on March 7, 2014, a true and correct copy of the foregoing **PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF** was served in accordance with Rule 5, Federal Rules of Civil Procedure on the following counsel of record in the manner indicated:

## Via CM/ECF

Jonathan S. Kagan (SBN 166039)
jkagan@irell.com
Talin Gordnia (SBN 274213)
tgordnia@irell.com
1800 Avenue of the Stars
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

Rebecca L. Clifford (SBN 254105)
rclifford@irell.com
Nima Hefazi (SBN 272816)
nhefazi@irell.com
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, California 92660-6324
Telephone: (949) 760-0991
Facsimile: (949) 760-5200

*s/ George C. Summerfield*
George C. Summerfield
STADHEIM & GREAR LTD.

*Attorney for Plaintiff
Brixham Solutions, Ltd.*